UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*****************************

UNITED STATES OF AMERICA,
         Plaintiff

vs.                                Case No. 1:17-cr-10066-IT-10

JUAN MANUEL TEJADA-SERRANO
a/k/a JOSE R. NARVAEZ-ARROYO,
         Defendant

*****************************

TRANSCRIPT OF PROBABLE CAUSE HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
AT BOSTON, MASSACHUSETTS
ON MARCH 20, 2017

APPEARANCES:

For the Plaintiff:
Theodore B. Heinrich, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3245

For the Defendant:
James B. Krasnoo, Esquire
Krasnoo, Klehm & Falkner, LLP
28 Andover Street, Suite 240
Andover, Massachusetts 01810
978-475-9955

Transcriber:  Karen M. Aveyard,
             Approved Federal Court Transcriber

-----------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

<u>I N D E X</u>

Witness:                                                    Cross

Special Agent Carl Rideout
(By Mr. Krasnoo)                                              4

<u>E X H I B I T S</u>

No.                                                          Page

                        None.

1                    P R O C E E D I N G S

2

3          THE CLERK:  The United States District Court for the

4   District of Massachusetts is now in session on March 20th, the

5   year 2017, in the matter of the United States of America versus

6   Jose Arroyo, Criminal Case No. 2017-5074.

7          Could counsel please identify themselves for the

8   record.

9          MR. HEINRICH:  Good afternoon, your Honor.  Ted

10  Heinrich for the Government.

11         MR. KRASNOO:  Good afternoon, your Honor.  James

12  Krasnoo for the defendant, Jose Arroyo, who is present with me

13  at counsel table.

14         THE COURT:  Can we please swear in the interpreter.

15         (The Interpreter was sworn.)

16         THE CLERK:  Please identify yourself for the record.

17         THE INTERPRETER:  For the record, my name is Deborah

18  Huacuja.

19         THE COURT:  Thank you.

20         THE INTERPRETER:  Thank you.

21         THE COURT:  We're scheduled for a probable cause and

22  detention?

23         THE CLERK:  This is a PC hearing.

24         THE COURT:  Just PC and not detention?

25         THE CLERK:  (Inaudible.)

1          THE COURT:  A probable cause hearing.

2          How are we proceeding?

3          MR. HEINRICH:  Yes, your Honor.  The Government calls

4    Carl Rideout, and we propose to proceed by having the Court

5    consider his affidavit in support of the Criminal Complaint as

6    his direct testimony and have him be subject to questioning,

7    cross-examination by Mr. Krasnoo.

8          (The Witness was sworn.)

9          THE CLERK:  Please state your full name, spelling your

10   last name for the record.

11         THE WITNESS:  Carl Rideout, R-I-D-E-O-U-T.

12         THE COURT:  The Court will accept your affidavit in

13   support of the Criminal Complaint as your direct testimony.

14         Mr. Heinrich, is there anything you want to add?

15         MR. HEINRICH:  No, your Honor.  Thank you.

16         THE COURT:  Mr. Krasnoo?

17         MR. KRASNOO:  Yes, your Honor.

18         **CROSS-EXAMINATION OF SPECIAL AGENT CARL RIDEOUT**

19   **BY MR. KRASNOO:**

20   **Q.**   Mr. Rideout, when did you first hear the name "Pacha"?

21   **A.**   I'm not exactly sure when I first heard it.  It was over

22   the wiretap investigation.

23   **Q.**   And when you heard it over the wiretap investigation, was

24   there already a wiretap in place on my client?

25   **A.**   There was never a wiretap directly placed on your client.

1    He was intercepted.

2    **Q.**    So you heard a voice of someone who identified himself as

3    Pacha over the phone on an intercepted phone call between the

4    person named Pacha and another; is that correct?

5    **A.**    Correct.

6    **Q.**    And who was the other with whom you heard the phone call?

7    **A.**    An individual by the name of Alex that was the subject of

8    the wiretap.

9    **Q.**    And Alex's last name is?

10    **A.**    Lugo-Guerrero, subsequently identified.

11    **Q.**    Now, in your affidavit, you mentioned that Alex had a

12    series of phone calls with Pacha; is that correct?

13    **A.**    Correct.

14    **Q.**    How many phone calls?

15    **A.**    That's in the affidavit or total?

16    **Q.**    In total between Alex and Pacha.

17    **A.**    I'm not sure.

18    **Q.**    More than five?

19    **A.**    Yes.

20    **Q.**    More than 50?

21    **A.**    Like I said, without going back over the wiretap, it

22    wouldn't be fair for me to say the amount, the total amount,

23    but there was quite a few.

24    **Q.**    Is your best estimate over 20, say?

25    **A.**    Yes.

**Q.**   Over what period of time did these conversations occur

from the time you first heard Pacha on the phone until you no

longer heard it?

**A.**   Probably, say, late 2016, early 2017.

**Q.**   And by "late 2016," we mean October or November or

December?

**A.**   Yes.

**Q.**   Which one of the three months that I've mentioned would be

the closest to date you could approximate?

**A.**   Probably October.

**Q.**   And you say it ended in early 2017.

        Are we down to March of 2017 or?

**A.**   February.

**Q.**   February.

        Now, in your affidavit, you mention two particular

drug sales that are negotiated; is that correct?

**A.**   Yes.  One was a transaction; the other one was an

attempted transaction.

**Q.**   And with regard to the one that was a transaction, that

was the first one in time; is that correct?

**A.**   That's stated in the affidavit, correct.

**Q.**   And did the very first phone call in which you intercepted

Pacha have any detains relating to the first transaction?

**A.**   The first time we intercepted him?

**Q.**   Yes.

1  **A.**   I'm not sure.  I believe no.

2  **Q.**   Are you able to tell us, the first transaction occurred on

3  what date, sir?

4  **A.**   I believe it was January 2nd or 3rd.

5  **Q.**   And the attempted transaction occurred January 5th; isn't

6  that correct?

7  **A.**   Correct.

8  **Q.**   So what did the nature of the conversations from October

9  2016 up to January of 2017 involve?

10  **A.**   Narcotics and related -- like I said, I don't know exactly

11  when we first started intercepting Pacha over the wiretap

12  without going back and going through all the calls.  It's

13  difficult to say.

14  **Q.**   Do you know when you determined that Pacha was someone who

15  was a co-conspirator with Alex to try to effectuate sales of

16  drugs?

17  **A.**   No, I don't have the exact date.  No.

18  **Q.**   Do you know what month that occurred?

19  **A.**   No.

20  **Q.**   Do you know how many phone calls occurred between Pacha

21  and Alex before you came to that determination?

22  **A.**   No.

23  **Q.**   You were the case agent, weren't you?

24  **A.**   Correct.

25  **Q.**   You listened to, at least at one time, all of the

1    conversations that occurred?

2    **A.**    I reviewed them, yes.

3    **Q.**    Now, you mentioned specifically eight phone calls

4    beginning at 12:58 p.m. on January 3rd between Pacha and Alex

5    that resulted in Alex purchasing a key of suspected Fentanyl in

6    the evening.

7           Do you recall that?

8    **A.**    Yes.

9    **Q.**    Do you know how it was that Alex and Pacha first had

10   contact with one another?

11          Let me withdraw that and put it another way.

12          Did any of the conversations in which you overheard

13   Pacha reflect any background history between Alex and Pacha?

14   **A.**    I don't recall.

15   **Q.**    Do you know they first knew one another?

16   **A.**    No.

17   **Q.**    Do you know how they first came in contact with one

18   another?

19   **A.**    No.

20   **Q.**    Now, did you survey this particular transaction?

21   **A.**    Yes.

22   **Q.**    And how many agents were in place to observe it?

23   **A.**    That was out there, probably approximately ten.

24   **Q.**    And of the ten, did anyone actually observe any handoff

25   from one drug seller to another?

**A.**   No, we just saw them meet.  We didn't actually see -- it was at night.  We didn't actually see the actual handoff.

**Q.**   In these conversations, according to your affidavit, Pacha was a broker of the deal; is that correct?

**A.**   Appeared to be.

**Q.**   And was there any discussion as to how much money Pacha was to receive for brokering the deal?

**A.**   On the first one?

**Q.**   Yes.

**A.**   Yes.

**Q.**   And how much was it?

**A.**   I believe it was either 3 to $400 or 2 to $400, somewhere in that neighborhood.  Several hundred dollars.

**Q.**   Three or $400?

**A.**   A couple hundred dollars.

**Q.**   And was that a negotiation that occurred on the phone call between Pacha and Alex?

**A.**   They discussed it.  I think it was more of how much he was going to profit, you know, but he was going to be paid for it.

**Q.**   Did you ever overhear Pacha on an intercepted phone call with anyone other than Alex during the course of the entire conspiracy?

**A.**   No, we were intercepting Alex's phones.

**Q.**   Now, at the time that you had agents out there to observe the transaction, did you or any know what Pacha looked like?

1    **A.**    I don't believe so.

2    **Q.**    And did you identify Pacha on that evening during the

3    surveillance?

4    **A.**    No.

5    **Q.**    So as of January 3rd after the surveillance was over, the

6    identity of Pacha still remained unknown as a physical matter

7    to the agents; is that correct?

8    **A.**    No, we subsequently had him ID'ed.

9    **Q.**    And how did you do that?

10   **A.**    Through a vehicle stop coordinated with the Boston Police

11   Department.

12   **Q.**    Was there any alleged traffic violation that occurred that

13   prompted the traffic stop by the police?

14   **A.**    No, it was under my direction.

15   **Q.**    So basically you ordered another police officer to bring

16   the car to a stop for purposes of identifying the occupants?

17   **A.**    No, the car was already stopped.

18   **Q.**    But you ordered that officer to identify the occupants; is

19   that correct?

20   **A.**    Yes.

21   **Q.**    And was there a license or identification provided by the

22   person in the car?

23   **A.**    Yes.

24   **Q.**    How did you make a determination that one of those

25   occupants of the car was a person with the nickname of Pacha?

**A.**   Well, through the identification.  If you want to take a
step back, based on the telephone calls that were intercepted
Pacha on, we then, utilizing what they call a Ping Order, a
Precision Location Order, identified where he was staying.
From there, we established surveillance in that area.  We saw
Pacha leave.  We then tracked the pings as the pings moved, as
the car moved.  It was fair to say that the phone was inside
the car.  And then once he stopped off of Blue Hill Avenue, we
had Boston Police Department do an identification stop.

**Q.**   When they did the identification stop, did the Boston
Police secure or have in their possession at any time during
the stop the phone?

**A.**   No.

**Q.**   Did the police officer -- did any police officer tell you
later after the stop or during the stop that he or she had seen
the phone?

**A.**   No.

**Q.**   Now, did Pacha, when you heard him over the phone, speak
only Spanish?

**A.**   I believe so, yes.

**Q.**   So when there are quotations as to what he said attributed
to Pacha in the affidavit in English, that's a translation that
you relied upon; is that correct?

**A.**   Correct.

**Q.**   Now, did you yourself ever physically see this person Alex

1    during the transaction of January 3, 2017?

2    **A.**    No.

3    **Q.**    Did you yourself personally see Pacha during this

4    transaction of January 3, 2017?

5    **A.**    I believe the person that I saw was him, but I couldn't

6    make a positive identification because it was dark.

7    **Q.**    According to the information in your affidavit at Page 35,

8    Pacha, as a broker, was representing, for want of a better

9    word, others who were selling the drug; is that correct?

10   **A.**    Yes, I believe he was a broker.  He was arranging kilogram

11   quantities between his source, or people he represented, and

12   Mr. Lugo-Guerrero, also known as Alex.

13   **Q.**    Did you ever see any -- how many persons were under

14   observation on the night of January 3 at the drug sale?

15   **A.**    Three or four.

16   **Q.**    And with regard to the three or four, have you presently

17   identified any of those as being the persons for whom

18   Mr. Arroyo brokered on that evening?

19   **A.**    We did see observations of who we believe was the ultimate

20   source of the narcotics.

21   **Q.**    And have you identified that person by name?

22   **A.**    No.

23   **Q.**    Did you learn as a result of the -- strike that.

24           Did you follow that person or persons after the

25   transaction was finished?

1    **A.**   Yes.

2    **Q.**   And did you, as a result, see an ultimate location where

3    they went, either to reside or entered for the evening?

4    **A.**   No.

5    **Q.**   As a result of this transaction, did you cause any pole

6    camera to be placed in the area where you believe Pacha to

7    reside?

8    **A.**   No.

9    **Q.**   Did you have -- did you ever apply for an intercept on

10   Pacha's phone?

11   **A.**   A wire, no.

12   **Q.**   A wire.

13   **A.**   No.

14   **Q.**   I'm not talking about the ping.

15   **A.**   Correct.

16   **Q.**   Now, you indicated that you had a Ping Order.

17          Was it in place as of January 3, 2017?

18   **A.**   No.

19   **Q.**   So you got it only after that date or on that date?

20   **A.**   It was after.

21   **Q.**   And did that Ping Order expire at a certain point?

22   **A.**   Yes.

23   **Q.**   And did it expire before or after the second transaction

24   that occurred -- attempted transaction on January 5th?

25   **A.**   We didn't have the ping at that time.  It was after that.

1  **Q.**   From the time of January 5th on when you had the ping, did

2  the ping give you any information as to whether or not Pacha

3  had any further contact with Alex?

4  **A.**   Utilizing the ping or the intercept?

5  **Q.**   Using the ping.

6  **A.**   I'm not following you.

7  **Q.**   Did the ping on Mr. Arroyo's phone after January 5th show

8  you at any time that he was in the same physical location as

9  Alex?

10  **A.**   Without going through all the data, that would be

11  difficult to establish.

12  **Q.**   In your affidavit, as to the second transaction, you also

13  refer to someone named Rodriguez.

14        Who is that?

15  **A.**   Without looking at the affidavit, I believe it's possibly

16  Glendalee Rodriguez.

17  **Q.**   And this was a person further described in the affidavit

18  as being observed by investigator with Alex arriving at a

19  specific location near a Honda Accord in a white pickup truck.

20        Does that help you identify which Rodriguez it is?

21  **A.**   I believe it's Glendalee Rodriguez.

22  **Q.**   And you also identify a person named Hernandez-Diaz.

23        Do you know who that person is?

24  **A.**   Yes.

25  **Q.**   And who is that?

1   **A.**   He's a co-defendant in the investigation.

2   **Q.**   And is Ms. Rodriguez -- is it Ms. Rodriguez?

3   **A.**   Yes, Glendalee Rodriguez.

4   **Q.**   And is she a co-defendant?

5   **A.**   She is.

6   **Q.**   Now, you state on Page 37 of your affidavit in

7   Paragraph 43 that on January 5, 2017, Alex and Rodriguez and

8   Hernandez-Diaz attempted to rob Pacha's source of two kilograms

9   of Fentanyl or cocaine, but the meeting did not go forward.

10          Can you tell us, other than the conversations between

11  Alex and Rodriguez and/or Hernandez-Diaz that were intercepted,

12  did you have any other information showing an attempt to rob

13  Pacha's source of two kilograms of Fentanyl or cocaine?

14  **A.**   Yes.

15  **Q.**   And what was that?

16  **A.**   To Rodriguez.  Also, to another individual where

17  Mr. Lugo-Guerrero, Alex, was trying to obtain counterfeit money

18  for the exchange, basically to provide counterfeit money to

19  Mr. Arroyo for the exchange.

20  **Q.**   Now, did you hear Mr. Arroyo on any wiretap directly with

21  Rodriguez and/or Hernandez-Diaz?

22  **A.**   No.  Again, we were not up on those phones.  We were out

23  on Mr. Lugo-Guerrero's phone.

24  **Q.**   Now, there was discussion in those phone calls as to where

25  the meeting was to occur; is that correct?

1    **A.**    Yes.

2    **Q.**    And the discussions involved where Alex wanted it in one

3    place and Pacha said that his people did not want it in that

4    place; is that correct?

5    **A.**    No.  I believe that it was pretty mutual where they were

6    going to meet.  I think it was just more of how the transaction

7    was going to transpire.

8    **Q.**    Where were they going to meet?

9    **A.**    In the area of Florence Road (PHONETIC) in Mattapan.

10   **Q.**    And was there a specific address there?

11   **A.**    They didn't give a specific.  It was at an intersection.

12   I think it's Fremont Street (PHONETIC) and Florence Road.  I'm

13   not sure of the crossroad.

14   **Q.**    Did you have agents there at any time on the evening of

15   January 5?

16   **A.**    Yes.

17   **Q.**    And did they observe Mr. Pacha, the person named Pacha, in

18   the area?

19   **A.**    The person I believe to be him, yes.

20   **Q.**    Was there any agent there who identified the person you

21   believed to be Pacha on January 5th as being a person who was

22   one of the four that was observed at the transaction on

23   January 3rd?

24   **A.**    We had surveillance.  Again, it was dark out on both

25   occasions.  It was more of the detailed intercepted telephone

1    calls that transaction was taking place and had taken place.

2    **Q.**   Now, were you personally at the intersection on January 5?

3    **A.**   I was.

4    **Q.**   And when you got there, did you see this gentleman come

5    there even though it was dark, or the person you believed to be

6    this gentleman come there?

7    **A.**   Yes, I did.

8    **Q.**   When did you get to the intersection?

9    **A.**   A half hour, maybe an hour, before it was to take place.

10   **Q.**   And do you recall the approximate time it was to take

11   place?

12   **A.**   I do not.

13   **Q.**   Was it after it was dark out though?

14   **A.**   Correct.

15   **Q.**   Was it closer to six o'clock being dark in the winter or

16   was it closer to nine or ten o'clock being dark in the winter?

17   **A.**   The later.  It was dark.  It was probably in the area of

18   maybe nine o'clock, ten o'clock.

19   **Q.**   Now, how many persons did you see come to the intersection

20   at that time of night did you believe to be participants in

21   this attempted delivery of drugs?

22   **A.**   Which date?

23   **Q.**   On January 5.

24   **A.**   I saw a couple vehicles arrive, come and go.  I saw

25   Glendalee, Wilmi Hernandez arrive.  I saw an individual I

1   believe to be Mr. Arroyo arrive.  So probably in the

2   neighborhood of maybe four people, five people.

3   **Q.**   Did Mr. Arroyo come in his own vehicle?

4   **A.**   No.

5   **Q.**   Did he come accompanied by anyone else?

6   **A.**   No, I don't believe so.

7   **Q.**   Did you, at that evening, identify any of the people that

8   you believe to be Mr. Pacha's source, the persons for whom he

9   was brokering?

10  **A.**   No.

11  **Q.**   Is it fair to state the principle way in which you know

12  that Alex and Rodriguez and Hernandez-Diaz were attempting to

13  rob Pacha's source was from the conversations they had over the

14  phone with one another that were the subject of intercepts?

15  **A.**   Conversations and surveillance, physical surveillance.

16  **Q.**   What physical surveillance did you observe that let you

17  know that they were going to attempt to rob Pacha's sources?

18  **A.**   Essentially, Glendalee Rodriguez and Wilmi Hernandez-Diaz

19  in Glendalee's vehicle went to the meet location, met up with

20  the individual I belive is going to be Mr. Arroyo.  They drove

21  around the block several times, things of that nature.

22          We were there basically to avoid -- if there was going

23  to be a robbery, we were going to avoid the robbery.

24  **Q.**   Now, you said they drove around the block several times.

25          Did all three of those persons converge in one car?

1    **A.**    No.

2    **Q.**    So who were the ones that were driving around the block

3    several times?

4    **A.**    Rodriguez and Hernandez-Diaz.

5    **Q.**    And were they in one car?

6    **A.**    Correct.

7    **Q.**    And Mr. Arroyo came in another car, right?

8    **A.**    Correct.

9    **Q.**    And was someone in his car with him?

10   **A.**    I don't believe so.  I don't think we ever identified if

11   he came with anybody.

12   **Q.**    And Mr. Arroyo did not drive around the block several

13   times?

14   **A.**    I don't recall.  I don't believe he did.

15   **Q.**    Are there DA-6s or FBI-302s that document the surveillance

16   efforts of the law enforcement agents on the night of

17   January 5th?

18   **A.**    I believe so, yes.

19   **Q.**    And are there also -- is that equally true for the night

20   of January 3rd?

21   **A.**    I believe so, yes.

22   **Q.**    After January 5th when the sale was aborted, was there

23   further conversation between Pacha and Alex on an intercept?

24   **A.**    Yes.

25   **Q.**    And what did the nature of those phone calls involve?

1    **A.**    Same thing, Alex contacted Pacha, I believe, for a kilo of

2    suspected either Fentanyl or cocaine.

3    **Q.**    And did that sale ever effectuate?

4    **A.**    No.

5    **Q.**    Was it Alex --

6    **A.**    Excuse me, I don't believe it did.

7    **Q.**    Was it Alex who initiated the phone call with Pacha?

8    **A.**    I'm not sure, but I believe so.

9    **Q.**    And was there a date selected as to when the intended

10   transaction was to occur?

11   **A.**    No.  I think it was to the effect of Mr. Arroyo was going

12   to check with his sources and get back to Mr. Lugo-Guerrero.

13   **Q.**    And did Mr. Arroyo ever report back to Alex what his

14   sources said?

15   **A.**    I don't believe so.

16   **Q.**    Now, at some point you learned that Pacha had some kind of

17   a medical condition; is that correct?

18   **A.**    Correct.

19   **Q.**    When did you do so?

20   **A.**    I think there were calls, intercepts, about him having

21   medical issues, and then subsequently, based on when we did the

22   identification stop, he identified to the officers of the

23   Boston Police Department that he had a medical issue.  In fact,

24   I believe he said he was going to the doctors or the hospital

25   that day because of the issue.

**Q.**    Did you verify as to whether or not he did or did not have

a medical issue, or take steps to?

**A.**    Yeah, I believe he does.

**Q.**    And did you, as part of your investigation, take any steps

to determine that he did have a medical issue?

**A.**    In terms of?

**Q.**    Did you contact doctors, did you get hospital records, did

you survey him going to a hospital?

**A.**    Through the location of his telephone, I believe that he

did go to the hospital, and he stayed at two different

hospitals in the Boston area.

**Q.**    Did you continue the ping on his phone up to the time of

his arrest?

**A.**    No.

**Q.**    From the time of January 5 -- he was arrested in March;

was he not?

**A.**    No, I believe it was February.

**Q.**    Of 2017?

**A.**    Correct.

**Q.**    From the time of the January 5, 2017 aborted transaction

until the time he was arrested, did you obtain any information

to indicate that he had engaged in further narcotic

transactions?

**A.**    Like the telephone call I specified earlier with

Mr. Lugo-Guerrero.

1   **Q.**   But you don't know whether that particular transaction

2   occurred or did not occur, do you?

3   **A.**   Correct.

4   **Q.**   Do you know of any transaction that occurred from

5   January 5, 2017 until the time of Mr. Arroyo's arrest?

6   **A.**   No.

7   **Q.**   At no time -- strike that.

8         According to the conversations that you intercepted

9   between Alex and Pacha, was there any conversation in those

10   telephone calls after January 5, 2017 that indicated that Pacha

11   became aware that his clients, for want of a better word, at

12   brokering were subject to attempted robbery by Alex?

13   **A.**   Not that I'm aware of, no.

14   **Q.**   Now, at one point in your affidavit, you quote (inaudible)

15   addition to a conversation by Hernandez-Diaz saying that, in

16   essence, "If he takes it from their hands, I'm going to get out

17   and I'm going to beat and cut him, that Pasha."

18         THE INTERPRETER:  I'm sorry, can you repeat that?

19         MR. KRASNOO:  Yes.

20         Hernandez-Diaz said, "If he takes it from their hands,

21   I'm going to get out and I'm going to beat and cut him, that

22   Pacha."

23   BY MR. KRASNOO:

24   **Q.**   "I'm just telling you, I don't care that he had surgery

25   recently," and then he uses an expletive.

1          And Alex responded by saying, "Slap him really hard,

2    but don't cut him."

3          Do you recall that portion of your affidavit, reciting

4    that info on Page 40?

5    **A.**    Yes.

6    **Q.**    Had Hernandez-Diaz determined, based on the conversation

7    that you had, that he was going to physically stab or cut Pacha

8    in the robbery if Pacha had the drugs in his hands?

9    **A.**    There was calls about that.  That's why we were there.

10              THE INTERPRETER:  That's why what?

11              THE WITNESS:  That's why we were there.

12   BY MR. KRASNOO:

13   **Q.**    And when Alex said, "I don't care that he had surgery,"

14   did you believe that that referred to Pacha?

15   **A.**    Yes.

16   **Q.**    Did you have any information to indicate before you heard

17   that on the wiretap that Pacha had had surgery?

18   **A.**    There might have been calls early on in the investigation

19   about him having medical issues.

20   **Q.**    You didn't know what the medical problem was as of the

21   time of January 5, did you?

22   **A.**    I don't believe so.

23   **Q.**    And you know what it is today, right?

24   **A.**    I have a rough idea.

25   **Q.**    What's the rough idea?

1   **A.**   I'm not a doctor.  Yeah, some type of heart condition.

2   **Q.**   Now, at some point you determined to arrest Pacha; is that

3   correct?

4   **A.**   We did.

5   **Q.**   And did you delay the arrest of him because he was at the

6   Mass. General Hospital recovering from surgery?

7   **A.**   It was a combination of things.  We weren't sure exactly

8   where he was, what his conditions were, stuff of that nature,

9   and then coupled with the ongoing -- I mean, the investigation,

10  the takedown of the primary investigation, he kind of went

11  secondary.

12  **Q.**   When you took him into custody, there was no violence

13  associated with that arrest; is that correct?

14  **A.**   No.  Correct.

15  **Q.**   And to your knowledge, at no time during the investigation

16  was there any reference on his part of possession of a weapon?

17  **A.**   I don't believe so.

18  **Q.**   And as far as you know, he performed no acts of violence

19  during the period of time that you had him under surveillance;

20  is that correct?

21  **A.**   That I'm aware of, correct.

22          MR. KRASNOO:  May I have a moment, your Honor?

23          THE COURT:  Yes.

24          (Pause.)

25  BY MR. KRASNOO:

1   **Q.**   Sir, you have not yet received back the results of any

2   chemical analysis from the transaction that occurred on

3   January 3, 2017; is that correct?

4   **A.**   There was no seizure on that date.

5   **Q.**   There was no seizure?

6   **A.**   Correct.

7   **Q.**   And there was no seizure on January 5th; is that correct?

8   **A.**   Correct, the transaction never happened.

9   **Q.**   So the reason you believe it to involve drugs is based on

10  the communications that you intercepted during the wiretap; is

11  that correct?

12  **A.**   That and the surveillance portion of it, yes.

13  **Q.**   But the surveillance showed no transfer of drugs, only

14  that the people who intended to meet based on the wiretaps did,

15  in fact, meet; is that correct?

16  **A.**   Correct.

17         MR. KRASNOO:  I have nothing further of this witness,

18  your Honor.

19         THE COURT:  Mr. Heinrich?

20         MR. HEINRICH:  Nothing further, your Honor.  Thank

21  you.

22         THE COURT:  Does the Government want to be heard on

23  probable cause?

24         MR. HEINRICH:  I don't think I need to be heard.  I'm

25  happy to respond to any questions that the Court may have.  I

1    think the evidence is --

2            THE COURT:  But do you want to just summarize?

3            MR. HEINRICH:  Well, yeah.  I mean, obviously the

4    strongest evidence is from January 3rd where Alex and Pacha

5    have a number of conversations, and those conversations are

6    followed by surveillance in which they see Alex and Pacha come

7    to the same place, along with another individual who is

8    presumably the source.

9            The conversations are pretty clear.  Alex asks, "Do

10   you have anything?"

11           Pacha responds, "Yeah.  The man is going to get you

12   the whole one."

13           Alex says, "Have him get it because I need that.  I

14   have people waiting."

15           Those all seem to me to be fairly subject to the

16   inference that Alex is obtaining drugs because he has customers

17   waiting, that he wants to distribute to them.

18           They talk in coded language, Excerpt 31 and

19   Excerpt 32, which roughly corresponds to a price.  After the

20   surveillance that shows that they have met, they intercepted

21   conversations.

22           For example, Alex says, "This is great.  Damn, Pacha,

23   those people are just handing that over.  Did you take your

24   money?  You grabbed your 200 and gave them 31 1/2?"

25           Pacha said he had.

1          Alex said, "Listen, I'm going to call someone and I'm

2     going to hand this over to him at 35.  Do they have more?"

3          And Pacha said, "Yes, of course."

4          I think together with all the other information, this

5     more than adequately establishes probable cause that Pacha and

6     Alex had agreed as part of Alex's ongoing activities to conduct

7     at least two transactions of cocaine, one in which -- the

8     latter in which Pacha was unwittingly possibly going to be

9     robbed.

10         Thank you, your Honor.

11         THE COURT:  Mr. Krasnoo?

12         MR. KRASNOO:  Yes.

13         Your Honor, let me start off with the January 5th

14    transaction.  The agent characterizes that as an attempt, I

15    think, under federal law.  The actions of the defendant fall

16    far short of being an attempt, and that's number one.  Number

17    two, I believe since Alex formed the intention to rob before

18    the conversation of January 5 even begins, according to the

19    evidence in the affidavit, that none of that is an act in

20    furtherance of the conspiracy on the part of Pacha and cannot

21    be used against him; that when A decides to rob B, that's not

22    an act in furtherance of the conspiracy that's alleged by the

23    Government between A and B because there are cross-purposes,

24    and, therefore, there can be no agreement for those purposes.

25         So this case boils down to the one transaction of

1    January 3 in which my client allegedly is a broker for a

2    quantity of drug that does not appear to be sufficiently

3    identified.  A whole one, what does that mean?  A whole one can

4    mean different things for different kinds of drugs.  The

5    Government suspects without any knowledge that it's Fentanyl.

6    They don't have any drug there to prove that it's Fentanyl as

7    opposed to heroin, as opposed to cocaine, and the information

8    they got through the wiretap of Pacha shows a willingness to

9    participate, but shows no actual participation.  The question

10   is who he's willing to participate with.

11        It's not an act in furtherance of conspiracy, I claim,

12   if he is brokering for sellers who are not alleged to be part

13   of the conspiracy, because buyers and sellers aren't conspiring

14   to do anything.  They're agreeing to contract, but they're not

15   agreeing to be co-conspirators to further distribution for the

16   same purposes of the two co-conspirators.

17        To this extent, to the fact that the broker represents

18   the sellers of the transaction, he cannot be, therefore, in a

19   conspiracy with Alex and later, Hernandez-Diaz, who is trying

20   to rob him, and Rodriguez, who is trying to rob him with Alex.

21        For those reasons, your Honor, I suggest that the

22   Government fails to establish a probable cause in this matter

23   with regard to this conspiracy as it's presently alleged by the

24   Government in the Complaint.

25        MR. HEINRICH:  Five quick responses.

1        Mr. Krasnoo mentions quantity, quantity is not an

2   element of the charged offense.  He mentions drug identity,

3   drug identity is not an element of a charged offense.  He

4   suggests that January 5th, because Mr. Lugo-Guerrero has

5   decided to try to rob Pacha, that that's not evidence of the

6   overall conspiracy.  The defendant's intention had not changed

7   and Mr. Lugo-Guerrero still had an intention to possess with

8   attempt to distribute narcotics.

9        But in any event, even if that were true, that doesn't

10   mean that the Court wouldn't consider what happened on

11   January 5th as evidence that Mr. Tejeda-Serrano had a prior

12   agreement with Mr. Lugo-Guerrero to distribute drugs.

13        And finally, people play various roles in large

14   conspiracies like this one, including that of a broker, those

15   who put together buyers and sellers, and the evidence is that

16   the defendant agreed to do that on at least three occasions:

17   January 3rd, January 5th, and on another occasion later on.

18        So for all those reasons, the Government believes that

19   there's more than adequate probable cause.

20        THE COURT:  I think for present purposes, the Court

21   does find probable cause.  There's sufficient basis to hold

22   this defendant.  Nothing in this ruling precludes defense

23   counsel from raising appropriate Motions to Dismiss if you feel

24   it warranted when the Indictment comes down.

25        MR. KRASNOO:  Note my objection to the Court's ruling.

1          THE COURT:  Yes.

2          MR. KRASNOO:  Let me report, your Honor, on my

3    client's medical status.  It appears possible that he has a new

4    infection.  He's being taken to Mass. General Hospital this

5    Thursday, March 23rd.  I don't know whether or not he will

6    remain at the hospital and neither does he.  I've asked him to

7    call me and let me know his health status.  I am seeking to

8    monitor it because I'm aware of what the Court ordered before,

9    that if at any time it determines that the Federal Government

10   is incapable of providing adequately for his health, that's a

11   matter that should be addressed before the Court.

12          THE COURT:  It sounds to me that he was brought to the

13   hospital, so that's a good thing.

14          MR. KRASNOO:  But they're going to arrange that he

15   goes to Mass. General, but I don't know whether or not he can

16   stay there or not if he has to.  That may be one other problem.

17          THE COURT:  Okay.  Is there anything further then on

18   this matter?

19          MR. HEINRICH:  No, your Honor.  Thank you.

20          THE COURT:  The Court finds probable cause.

21

22          (The hearing was concluded.)

23

24

25

C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 30 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

March 26, 2017

Date